Case number 23-3334, USA v. Terrence Jordan. Argument not to exceed 15 minutes per side. Mr. Stengel, you may proceed for the appellant. Good morning. Mike Stengel of the Memphis, Tennessee Bar. It's my privilege to be here on behalf of Terrence Jordan. I'd like to reserve three minutes for rebuttal. In light of the government's concession that his substantial rights were affected by plain error in the instructions on count three, I'd like to focus on the reason that this court's de novo review should result in the order denying suppression being granted. It's very clear that this court reviews the facts for clear error and conducts a de novo review of the legal conclusions. I'd point out that while frequently the district court has a substantial institutional advantage because it's listened to testimony and evaluated. I saw this argument in brief. I thought it's a fair point that the record was established. I guess my question is, why shouldn't Garrido Santana control here? It seems similar in kind, reasonable suspicions, a low bar. Here the officer, I mean, they had this weird route. They had just gotten a rental car and now they're driving it from Tampa, which is not their home, to Erie, which is their home. They're 17 hours away or something from returning it and they're caught in Ohio, passenger's nervous. I mean, why isn't all that enough to give an officer reasonable suspicion to detain them temporarily to do a dog sniff? I would suggest it's not for a couple of reasons. First of all, while the district court relied on the passenger's nervousness, what the record reflected is that the passenger was breathing heavy, according to the officer. I would suggest that the officer didn't investigate that. He didn't question that. Heavy breathing does not equal nervous behavior. Sure, but heavy breathing coupled with, if it's in the officer's perception, heavy breathing coupled with the weird route. The problem is you're dividing and conquering. You've got to look at the facts holistically. When you look at the facts holistically from the officer's perspective, you've got this really weird situation. They're driving through the night. She's giving evasive answers. They're going away from where they're supposed to return it. I mean, you couple all these together. Why isn't that enough? Judge, I would suggest that, number one, the route was not implausible. I'll start with Garrido. Well, explain to me why the route's not implausible when it's due and you're driving away. First of all, you usually rent a car at your home, then drive it, then drive it back. Here, they're renting a car in Tampa, driving it up to Erie the day before it's due. That is true, Your Honor. Through the night. They had driven it long drive, straight through. Somewhat unusual, but not unheard of. I would suggest the fact that this was fairly recently. It was June of 2021. COVID was 15 months old, and I think that changes how people were traveling, first of all. Second, they were clearly visiting a male relative in Tampa. The record is silent as to why they rented a car in Tampa to get home to Erie. Third, the- Don't you think it's odd you rent it and it's due back? If you rent it to get home and it's due back in a couple days, I mean, that seems like an odd rental period. You can rent it for a week. It does seem strange, Your Honor, but the record is silent as to why that occurred. But remember, he doesn't have to be certain. He doesn't even have to have a fair probability, right, for reasonable suspicion. That's correct. And so it's just, I mean, when you couple all this stuff, it's suspicious behavior. That's what he thinks. He did not use what I would suggest he was required to do, and that is the least intrusive manner to investigate and either dispel or confirm his suspicion. Well, a dog's pretty nonintrusive. It's more intrusive, number one, it takes a delay, and number two, it's more intrusive. You agree the delay was minimal in the grand scheme of things. I mean, you're talking, what, it's at 7 to 10 minutes somewhere at the most? Judge, I think the traffic stop video makes clear that somewhere around the 10 minutes and 40 seconds, 45 seconds in, he's calling for the dog. Sure, but it would have still, he had to issue the citation and stuff, and so the period of delay runs from when he would have given the citation until when the dog sniff occurred. That's correct. Okay. But I also think that it is more intrusive than questioning why the short rental period. The driver clearly had a plan, knew when it was due, knew where it was due, planned to return it in Tampa, was unsure when. A dog sniff does not answer the question of why the short rental period, why returning to Tampa, why not a one-way rental, why not a longer rental. Does he have to answer those questions, or once he's suspicious, is it? Because now, what you're going to ask, and then future case is going to say, look at how long they detained him, an hour to ask all these questions. You see what I'm saying? I mean, they've got to make a call pretty quick, and he was willing, it seemed like, to let him go if the dog sniff came back negative, so he was trying to get it done quick. He, indeed, he announced that he was ready to hit print on the ticket if the dog sniffed. Let me ask a follow-up question about the duty, if any, of the police officer to ask the person that he's talking to to explain away what initially seems to be suspicious behavior. The first time that you argue that is you argue that the police officer, apparently in your view, had a duty to ask the person, the passenger that was exhibiting heavy breathing, why are you breathing heavy? So is there any authority that you have to actually ask somebody if they can explain away why they're acting nervously or futively or whatever it may be? Judge, there's not authority that says that. I think that the authority, and the authority that I am relying on, is the authority, starting with the Supreme Court, that of course this court has recognized, about using the least obtrusive or least intrusive manner to confirm or dispel any suspicious behavior. But the key there is confirm or dispel, I think. And let me take you on to the next example, and then maybe you could answer both of them at the same time. You have said in your brief, and you've said this morning, that apparently you think the police officer had a duty to engage in a more extensive discussion with the driver about this idea of driving through the night and the car having to be returned 1,200 miles south the next day. Again, there's no authority that says the police officer had to pursue that by asking questions, right? Correct. And let's assume that he did ask the questions that you would have liked him to ask, and the police officer just simply, in his or her experience, just doesn't believe what the answers are. If you ask the question, are you then bound by the answer, or can you still say you had reasonable suspicion? Well, Your Honor, I think that it depends upon what the answer is and maybe how implausible the answer is. Does it also depend on the circumstances under which you're asking the question? I'm not saying that very well. This case, to me, seems to be a classic example of these two, at least two police officers, exhibiting drug courier activities. You go to a southern place that's a source of drugs, you run a car, you drive all through the night, and then your plan is to drop off the drugs and take it back tomorrow. You've handled these cases before, I assume, right? That's a fair statement. Would you concede that at least there's some indicia of the classic drug courier activity that's going on on I-75 or 71, whichever highway this was? Judge, I would concede, yeah, I guess I would concede that there's some indicia. And that's why these police officers are stationed in the median or hiding in the weeds or wherever they are along these major drug courier routes to get the drugs from the south to a hub, Detroit or Erie or wherever it might be.  I do not think that there are. Yes, there are law enforcement stationed along all manner of intersections. And they're looking for traffic infractions so they can pull somebody over and do a further investigation, the ultimate goal actually being to see if they're drug couriers, right? That gets into the officer's subjective intent. Right, which we don't look at as long as they really have violated the traffic laws, which no question they did that here. Correct, and Mr. Jordan has not contested the legality of the stop. So coming back to where I started, so I don't take up any more time here, in the situation here where it seems to be classic drug courier activities, why do you have to engage in a further conversation with the driver about these two different rental agreements, for example? Does it all come back to your least intrusive means? It does come back to, number one, what is suspicious, and if the officer believes it's suspicious, the least intrusive means. The reason that this case is, in my view, very different from all manner of cases that this court and other circuits and the Supreme Court have decided, is that first of all, while there was initially the wrong rental agreement provided, this car, when stopped, was being operated consistent with the rental agreement. The driver was the renter of the car, and it was within the rental period. In many cases, the anomaly is that the car is being driven outside the authority of the rental agreement. Isn't there an anomaly here that there's no way that they could have gotten the car back on a timely basis, under the facts of this case? While unusual, that wasn't really explored except for the fact that the driver said, I plan to extend the rental. Extension of rental is a fairly common phenomenon, and there was no follow-up. But why does he have to believe her? He's got these other factors that we've talked about that Judge Tappar explored with you. He's got those other factors, so why does her, assuming that he had asked the question, he gets a cogent answer about, I'm going to extend. Why does he have to believe that under the facts of this case? Well, I would suggest that it was an inappropriate question. He did ask the question. He didn't accept her answer. He said, I don't understand the process. So to cut to the chase, as a test, if we were to agree with you, what would you have us say in an opinion about what is the duty to ask follow-up questions and what is the discretion, if any, the officer has to disregard the answers? If you could write the opinion for us, what would you have us say? Judge, I would suggest that there's nothing magic about the opinion, that the opinion would simply say that the totality of the circumstances here do not rise to objectively reasonable suspicion. There weren't sufficient, specific, articulable facts. Let me ask you this, Mr. Steyer. What is your best case, do you think, that supports your position? Judge, I think that all of the cases that have been cited by both Mr. Jordan and the government show the substantial differences between this case and others. The others, the cases that talk about reasonable suspicion and support the search, talk about an anomaly, the car was being operated outside the rental agreement. They talk about an implausible route. Judge, the PAR mentioned Garrido. There, a Puerto Rican had flown from Puerto Rico to Miami, to Houston, to rent a car. The car was rented by his cousin, who was from New York, to drive to New York. That's very different from leaving a male relative in Tampa and driving to your home in Erie, Pennsylvania. Can you cite me a case that actually did agree that it was not reasonable suspicion and suppressed the evidence? What case can you cite us that's favorable to you? Judge, I would cite the close case of United States v. Johnson out of this court. It's 482 Fed Appendix 137.  That was one that basically was saying something about failing to provide paperwork is a weak indicator, a weak, nervous indicator, right? That's correct. There were a couple of facts there that this court found were insufficient. The car was stopped outside of Chattanooga. The rental agreement only allowed it to be operated in Florida, in Georgia. He was on the way to Kentucky. He was supposed to be visiting a woman he'd never met but had talked to several times. He was going to spend some time with her, and he had very little clothing. There was also degreaser in the car. And this court found that those were insufficient in the totality of the circumstances and ordered suppression. Anything further, Judge Gilman? No, no, I don't. No, thank you. Thank you, Counsel. You all have your full rebuttal. Thank you. May it please the Court, Daniel Reinke for the United States. One thing with the suppression that the district court relied on was, if you're watching the dash cam video, Jordan was the passenger, and you couldn't see whether Jordan was nervous in the dash cam video, right? You don't ever see Jordan in the dash cam video. You do see what you do hear, the audio, is pretty clear as to Sanders' responses. And the court put great weight on the fact that Sanders was kind of equivocating on, you know, why do you have this car and you're going to Erie? You know, you're still going north on 71. You have to be back in Tampa at 1130 the following morning. She didn't answer right away. She kind of, the court noted that she said um and ah a lot and was not really all that forthcoming. When she did finally say that she was going to extend the rental, that was kind of an almost prodding of the trooper, trooper blogging. She didn't come out with that right away. It wasn't like a consistent story throughout. It was kind of a developing story as the trooper asked questions after he got the correct rental agreement. The preliminary hearing transcript in state court, which the court considered during the suppression hearing, also talked about, you know, rental car factors that this court's already identified. Rental cars going from Florida, coming from a southern state. The fact that she had the wrong rental agreement, which shows that she's rented cars before, so it's not. Why is the wrong rental agreement relevant? I know you make something of that in your brief. I'm not sure I follow it. Can you explain to me why we should care? I mean she handed the wrong one, then she gets the right one and hands it to him. It's relevant in a couple ways. One, for the time, just for the time of the stop. It took, I think, he got the wrong rental agreement about five minutes into the video. I think he realized it was wrong. In four or five minutes he went back to the car, he got the right one, and it added to the reasonableness of the duration of the stop, for one. But secondly. We're not contesting the reasonableness of the total duration. They're only contesting the reasonableness of the additional duration. Right, that's correct. But it also shows that she had a history of renting cars. Why does it even show that? The one that she first produced seemed to be in a different name. If it was in her name, but for a different period, maybe you could make that argument. But the fact that somebody had left a rental agreement under a different name in a car, why is that significant one way or the other? It was a year-old rental agreement, too. I don't know that it was necessarily left in the car by the previous renter. But we don't know. But we do know that it was a year-old rental agreement that she thought was the right one. Now, why would she have two rental agreements? Because she rented this car, rented the same type of car. And there was confusion as they said the same car. They kept saying the same car, the same car. It wasn't the same car. It was the same make and model of car. But it showed that she had a history of renting cars, which went to the trooper's reasonable suspicion. Why does it even show that if the rental agreement for somebody else happened to be in the glove box for whatever reason it didn't get thrown away? Why is that indicia of anything? Well, I don't think it would be in the glove box for a year, Your Honor. I agree with Judge McKeague. It just seems like, okay, so what? There's another rental agreement in the glove box. She pulled it out. You have no explanation better than we have. No. But then we consider the rental agreement. Let's say the rental agreement is an innocent mistake. It was just there. When you consider the rental agreement, then you get the right rental agreement, and you see all the factors that the court considered, which this court has talked about going the opposite direction. What you're saying, just so I understand it, is they gave the wrong rental agreement. Then when they gave the right one, the right one was suspicious because of all the factors we've highlighted with your co-count and with your friend on the other side. Yes, Your Honor. Let me ask you a couple of questions here. How do you distinguish our case of the United States v. Richardson? You're familiar with that case? The 2004 Sixth Circuit decision. I'm sorry. There were three passengers who were extremely nervous. One of them even spilled the contents of her purse when the officer was questioning them. They gave different reasons for their travel. One said, oh, we've been visiting a doctor, and the other said, no, we were visiting a lawyer. Yet there was also one passenger shifted into the driver's seat, and yet we still found there was no reasonable suspicion. I think here nervousness wasn't the main factor. Jordan's heavy breathing was only one factor that the district court considered. The district court placed a significant weight on the other factors, the inconsistent travel plans, the inconsistent answers to the travel plans, the logistic improbability that this car could get back to Florida in time. She did say she was going to extend the rental, but, again, that was at the end of the interaction with the officer and really at his prodding. I'm asking you, how do you distinguish Richardson, where there was even more nervousness described than you've described here, where the Sixth Circuit decision said no reasonable suspicion? In fact, they said it was, you know, what you can't do, I guess you will concede, it's not enough for the officer just to have a hunch, right? If you have an ill-defined hunch that drugs may be involved, that's not enough. Would you concede that? Absolutely. Okay. So what we're trying to figure out is this, did this officer just objectively have simply a hunch or did he have something more than a hunch that would morph into reasonable suspicion? Richardson said that in those facts it was just a hunch. I think here it was more than a hunch based on what he found after he got the correct rental agreement and based on the driver's answers to his questions. It wasn't just a hunch. Oh, these people are driving from Florida to Erie, maybe they're transporting drugs. It was more based on all these inconsistencies and issues with the car and the logistics of when the car was getting back. I'm just curious if the record shows, what were the races of the people here? I mean, was the officer white? The video, I think, showed that he was, yes. What were the races of the occupants, Jordan and Sanders? They were both African American. I mean, is this a case of driving while black? I don't think so, Your Honor. Trooper Bloggett testified he wasn't out looking for, he was just out highway patrol in Ashland, Ohio, right by the highway patrol station there looking for speeders. He didn't stop. He stopped the car because they were going 90 miles an hour in a 70 mile an hour zone. I don't think there was any indication that he stopped them because they were African American driver and passenger. He stopped them for speeding, and then as the stop developed, these other factors came to light. Right. It's not a question of whether he had the right to stop them. Everybody concedes they were speeding. It's a question of what kind of questions and what his suspicions or hunches were once they stopped them. Were there any allegations? Tell me this. There's another case I'm interested in. Your Honor, are you familiar with our case of Joshua v. DeWitt from 2003? I'm sorry, Your Honor. I'm not familiar with that case. There's another case where the driver was driving with a rental car, appeared nervous and suspicious. The travel plans didn't make any sense whatsoever, according to the officer, and the officer learned that the driver was a quote, known drug courier. That sounds really bad, and yet this court said that wasn't enough to be reasonable sufficient. How do you distinguish that case from our situation? Again, I just think it goes back to the off the trooper and his experience, given that it was a rental car coming from Florida with inconsistent plans, going to Erie. They hadn't even gotten to Erie yet. They couldn't possibly even turn around and get it back to Florida in time. And then the passenger's nervousness, but that wasn't a major factor, and that can't, as this court knows, that can be considered in relation to other factors. That by in itself isn't enough for reasonable suspicion to extend the stop. The problem I'm having is we've got a couple of cases, this Richardson and this Joshua, where the facts seem to be at least as suspicious, you might say, as we got here, where this court said that wasn't enough, and yet you're trying to say, oh, but we can somehow distinguish those two cases, which I don't see how easily they are to distinguish. I assume you're relying a lot on that, what is it called, Greedo case? Yes, Your Honor, the Greedo-Santana case. Right, but that was one I think that, one, that car had a gas tank compartment that was commonly known to hide narcotics, and then the guy did fly from Puerto Rico to Miami to Houston to then drive to New York. I mean, you've got some really suspicious circumstances there, and the rental agreement, I think, isn't the one that was not in his name. That's correct. There are some differences. I mean, I can understand that would cross the line, but we don't have those additional facts here. Well, we have similar facts. We have they're going in the wrong direction. They're going home to Erie, Pennsylvania, from Florida. They have a car that they have to return to Florida. Why would they not rent it one way? Why would they rent it for longer? It's... The trouble I'm having is that, though, so anybody who's caught speeding and driving with a rental agreement that doesn't seem to quite add up how they're going to get it back without extending the rental agreement, that gives you a suspicion that they're a drug dealer and can call a K-9 unit to sniff out the car. Seems to me you're going to catch an awful lot of innocent people doing that. If that happens this time, they happen to catch somebody that did have drugs. But the law is that you can't just do this on hunches. You've got to have a reasonable suspicion, and I'm not sure that this is enough here. Judge Pearson found that all these factors, considered in their totality, which is how you have to look at it, was a reasonable suspicion to at least extend the stop. They couldn't get the car back. They were inconsistent on what they were talking about as to where they were going. The passenger appeared nervous. All those factors allowed for a very brief, maybe two- or three-minute extension of the stop to allow the drug dog to come and conducted a drug sniff of the car, which was a less obtrusive search. It's not like they searched them, they did anything. They just had the drug dog come. If the drug dog didn't alert, they would go on their way, which the officer told them in the video. Are there any other cases that you've found on behalf of the government where the police stop somebody that is driving a rental car and it's due 1,200 miles away the next day? Well, it was Gerardo Santana. Gerardo Santana wasn't faxed that it couldn't get back, was it? Well, it was due back in Houston. They were driving to New York, and it was due back in Houston the following day. All right. That's really our best case, Your Honor. There's a couple other cases, United States v. Branch, but that was an overdue rental by an extended period of time, like two weeks overdue. And then Johnson, but that was their inconsistent explanation of an occupant's travel plans. So if I could ask you, taking you in a slightly different direction, on the question of the jury instructions, even though only one party appealed, you agree that it should go back as to both of those parties, right? We do, Your Honor. And on the reasonable suspicion, you don't make that same concession because one party didn't appeal. But it seems to me that if we were to rule for the appellant in this case, we're just going to see this again in a 2255 down the road. Are you maintaining your position that we shouldn't extend the ruling, in this case, if it's favorable to the defendants, to the defendant who didn't appeal? I know that's sort of a strange situation. Yeah, right. I hadn't really thought about that. I mean, it's the same facts. It's the same case. It seems to me if it applies to one, it applies to the other. But you have the anomaly here that one side didn't appeal. That's true. And with the jury instruction, at least that's plain error. And so Sanders would be able to raise it with the district court letter as to that charge. I think so. I'm wondering if the difference from her viewpoint is that she has been released for time served on the drug charge. Is that correct? She is, Your Honor. She was charged in Counts 2 and 3 with possession with intent to distribute and the possession in furtherance of. She wasn't charged in Count 1. She was credited with time served on Count 2 and 60 months on Count 3.  So that's why she may not care about so much. It doesn't matter to her then. All right. That answers the question. Thank you. OK. Are there any questions as to the other jury instruction? The lesser included, simple possession? If there aren't, I would ask this court to affirm the district court. Any further questions? No further questions on my part. Thank you, Counsel. Thank you. Mr. Stengel, you get your full three minutes. Thank you, Your Honor. Excuse me. A couple of things. The district court mentioned fillers by the driver and the government brought it up in their argument. I would suggest that the fillers were not signs of nervousness or delayed speaking when you review the traffic stop video. It's a manner of speaking. I liken it to reading transcripts, which this court does a lot more than me. Questions at trial often start, OK, thank you, things like that. And so I don't think that that is something significant. I would suggest that the district court didn't really consider the totality of the circumstances. It made clear error on the heavy breathing, in my view. It did not . . . That's a big ask to say it made clear error. Judge Pearson looked at the same record and made a conclusion. That's correct. How do we show it stinks like a fish? Because what she said was she relied on nervous demeanor or behavior when the officer's comment was heavy breathing. I don't think the two are equal. That's . . . She's just characterizing it. It's not an error of fact. It's a big ask, Your Honor. All right. I am Mr. Jordan's advocate. I appreciate that. This really is, and the court recognizes, that it is a fact-bound determination. Many cases when this court supports and finds that the necessary reasonable suspicion existed have facts that are very different than here. The implausible travel, not unusual travel. I would suggest that this is . . . The hard thing I have is, for police officers, I think . . . We create a pretty difficult standard. I think Judge Gilman accurately recited some of our cases. Then you look at Garrido Smith. I don't envy you either. You're trying to walk a fine line. It seems like we should look at the totality of it. If an officer had more than a hunch and could believe something suspicious was going on, a drug dog isn't that intrusive. So allow the drug sniff, make sure it's prompt, as it was here, and then get on with it. Why shouldn't that be the way we look at this from just a common-sense perspective? I think that the common sense obviously needs to apply. But it shows factors that aren't pertinent here. There was many times the unusual travel or implausible travel. They separate people in the car, ask questions, and they get different stories. That didn't occur here. I would also suggest . . . So this was less intrusive in some way. It was, and it was less suspicious, Your Honor. Fact-bound determination. I've made Mr. Jordan's point. I would ask the court to vacate. And this court, I think, has two choices. It can either order that the suppression be granted or, given the unique situation here, it could vacate the convictions and remand for an evidentiary hearing on the suppression issue. Thank you, counsel. Thank you. We appreciate both of your thoughtful arguments. The case will be submitted.